# Illinois Official Reports

## Appellate Court

---

**_Morales v. Herrera_, 2016 IL App (1st) 153540**

---

| | |
|---|---|
| Appellate Court Caption | MARIA MORALES and MARICELA SANCHEZ, Plaintiffs-Appellants, v. ALBERTO HERRERA and RADIO FLYER, INC., Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-15-3540 |
| Filed | December 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2012-L-002133; the Hon. Edmund Ponce de Leon, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Sheldon J. Aberman, of Cary L. Wintroub & Associates, of Chicago, for appellants.<br><br>Julie A. Teuscher, Tomas P. Boylan, and Henry Oritz, of Cassiday Schade LLP, and Joel Stephen, of Beverly & Pause, both of Chicago, for appellees. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Justices Pucinski and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs Maria Morales and Maricela Sanchez were employees of Express Employment Professionals (Express), a temporary employment agency. On April 21, 2010, Express sent plaintiffs to work at Radio Flyer, Inc. (Radio), located at 6515 West Grand Avenue in Chicago. While Alberto Herrera, a supervisor at Radio, was driving plaintiffs from Radio's Chicago facility to its Elwood facility, a collision occurred. Plaintiffs received workers' compensation benefits through Express but nonetheless commenced this action against defendants Radio and Herrera. The trial court subsequently granted defendants summary judgment, finding that the exclusive remedy provision of the Workers' Compensation Act (Act) (820 ILCS 305/5 (West 2010)) barred plaintiffs' claims because plaintiffs were Radio's borrowed employees and the collision arose in the course of employment. We affirm the trial court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3    Express was in the business of sending its employees to temporarily work for entities such as Radio, but Express itself was responsible for paying employees' wages and withholding taxes as well as social security contributions. In April 2010, Express sent plaintiffs to do assembly work for Radio. Sanchez testified that Herrera, her supervisor at Radio, told her what to do and how to do it. Additionally, he told Sanchez when to start and stop working, although she generally worked from 8:30 a.m. to 5 p.m. Morales similarly testified that Herrera was her supervisor at Radio, although she considered Express, rather than Radio, to be her employer. Furthermore, Sheila Ryan, Express's general manager, testified that she was not present at the job site and expected plaintiffs to follow the directions of Radio's supervisors within the scope of the job identified by Radio. Ryan also testified, however, that "if we send someone in to be an assembler and all of a sudden they're on a forklift, that's an issue." Moreover, Ryan testified that Express's staffing agreement, which reflected the terms of its contract with Radio, provided that Radio would supervise, direct, and control the work of Express employees.

¶ 4    Express employees received a document containing Radio's policies, and Ryan expected her employees to adhere to that document, which stated that "[a]ll warehouse contract employees must comply with the code of conduct, policies and practices during an assignment with Radio Flyer." Additionally, the document stated, "[w]e have a zero tolerance policy at Radio Flyer, and [violations] if discovered, will lead to immediate dismissal from the assignment without the opportunity to return." Finally, the document stated, "[a]ll contract employees must communicate directly with their employer regarding policies, procedures and terms for their employment *with the Agency*." (Emphasis added.) Ryan testified that while employees would bring questions about Express's policies and procedures to the attention of Express, questions regarding their employment with Radio would be directed to Herrera.

¶ 5    Ryan acknowledged that Radio could have an Express employee removed for violating one of Radio's policies. Ryan might try to persuade an employer to deal with an issue in other ways, however. Additionally, Ryan testified that Radio could prevent a particular individual from working for it, even though Radio could not discharge an employee from Express or otherwise discipline Express employees. Similarly, Herrera, as well as AnnMarie Bastuga, Radio's vice president of human resources, stated that Herrera was responsible for determining plaintiffs' duties, schedules, and responsibilities and could determine whether plaintiffs' work should be stopped or terminated.

¶ 6    According to Herrera, he had instructed plaintiffs and Donald Bailey, another Express employee, to meet Herrera at Radio's parking lot in Chicago at 7 a.m. on the day in question. Herrera was to drive them to a distant facility in Elwood.[1] Sanchez testified, "We had to be there at 7:00 o'clock in the morning." Upon inquiry, Sanchez further testified it would be correct to say that Herrera "offered" her a ride. Moreover, this was not the first time that Herrera had transported plaintiffs to Elwood.

¶ 7    Plaintiffs and Bailey met Herrera in Radio's parking lot and they left at about 7 a.m. Sanchez testified that they would be paid for their time starting at 8 a.m. At about 7:25 a.m., however, Herrera was distracted and hit the vehicle in front of him. Plaintiffs never arrived at the Elwood facility that day, notwithstanding that they were paid for working eight hours. Instead, an ambulance took plaintiffs to the hospital. Sanchez sustained injuries to her chest and back while Morales sustained injuries to her neck, head, and back.

¶ 8    Ryan testified that when Bailey called Express's office following the collision, she did not understand what Express employees were doing in Herrera's car. Ryan testified that Express's staffing agreement provided that Radio was to notify Express if duties or the workplace were to change. In addition, plaintiffs were supposed to have started working at 8:30 a.m. in Chicago, and no one consulted her regarding a change in time or location. According to Ryan, the collision occurred approximately an hour before plaintiffs were supposed to have started working. Ryan further testified that while plaintiffs were not performing any delineated tasks at the time of the collision; they were being transported for the purpose of performing work for Radio. Ryan testified that they were "on the clock" for the purposes of workers' compensation, albeit not for Express's purposes. Ryan was later informed that plaintiffs thought she knew Herrera would be transporting them to Elwood.

¶ 9    Even if Radio had consulted with her, she would not have allowed Express employees to work in Elwood because it did not fall within Express's insurance coverage. Additionally, it was unreasonable to expect a worker earning $8.50 per hour to travel that distance. Furthermore, Elwood did not fall within her franchise's territory. After the accident, Ryan wrote to Karyn DeFalco, Radio's human resource director in Chicago:

> "At no time, past or present, was Mr. Herrera given authorization by Express *** to assign our associates to work in a facility other than 6515 W. Grand Ave., Chicago, IL. We appreciate all opportunities to work with Radio Flyer but respectfully decline employment for Chicago Express associates at locations outside of the facility located at 6515 W. Grand Ave., Chicago, IL 60635 unless the work is at alternative locations within the Chicago metro area comprised of Chicago, Melrose Park, Franklin Park, Schiller Park, Niles, Park Ridge, Morton Grove, Evanston and Skokie. If work should arise in the above stated locations please let us know and we will dispatch our associates accordingly. Any work located outside those areas can be accomplished by other Express offices and we will be happy to provide contact information at your request."

Bastuga's understanding from conversations with Herrera, however, was that Herrera had a long-standing practice of transporting Express employees to other Radio locations and Express was aware of that.

---

[1]Although testimony also indicated that Radio's other facility was in Joliet, we refer only to Elwood for consistency.

¶ 10    Plaintiffs then filed workers' compensation claims against Express. Express's insurance company paid the claims without contest. Additionally, plaintiffs filed this negligence action against defendants. Ultimately, Morales claimed about $1 million in damages while Sanchez claimed about $6000.

¶ 11    Radio moved for summary judgment, arguing that Radio was plaintiffs' borrowing employer, their injuries occurred in the scope of employment, and consequently, their claims against Radio were barred by the exclusive remedy provision of the Act. Similarly, Herrera moved for summary judgment, arguing that plaintiffs were Radio's borrowed employees as well as his coemployees. Thus, the exclusive remedy provision barred their claims against him as well. In response, plaintiffs maintained that genuine issues of material fact existed as to whether they were Radio's borrowed employees and whether they were injured in the course of employment. The trial court entered summary judgment in favor of defendants, finding plaintiffs were Radio's borrowed employees, and thus, the Act's exclusive remedy provision barred plaintiffs' claims against both defendants. Plaintiffs now appeal.[2]

¶ 12                                    II. ANALYSIS

¶ 13    Summary judgment is appropriate where affidavits, admissions, depositions, and pleadings reveal no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. *Prodanic v. Grossinger City Autocorp, Inc.*, 2012 IL App (1st) 110993, ¶ 13. In determining whether the record presents a genuine issue of material fact, courts consider the aforementioned items strictly against the movant and liberally in favor of the nonmovant. *Id.* Additionally, the court may draw inferences from undisputed facts but should deny summary judgment where reasonable persons could draw different inferences from those undisputed facts. *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). Although summary judgment is a drastic measure, it is to be encouraged in the interest of prompt disposition of lawsuits where the movant's right to judgment is clear. *Id.* Furthermore, we review an order granting summary judgment *de novo*. *Prodanic*, 2012 IL App (1st) 110993, ¶ 13. Accordingly, we may affirm the trial court's judgment on any basis in the record. *Reed v. Getco, LLC*, 2016 IL App (1st) 151801, ¶ 16.[3]

¶ 14    The Act protects workers from accidental workplace injuries by imposing resulting liability on their employers, regardless of fault. *Prodanic*, 2012 IL App (1st) 110993, ¶ 14. In exchange, section 5(a) states as follows: "No common law or statutory right to recover damages from the employer *** for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act." 820 ILCS 305/5

---

[2]We note that plaintiffs' appellate briefs repeatedly fail to include pin cites in citations to case law, as required by Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). *Babcock v. Wallace*, 2012 IL App (1st) 111090, ¶ 7. Additionally, plaintiffs make factual assertions without citation to the record. We remind counsel that the failure to comply with Rule 341 may result in forfeiture. *Old Second National Bank v. Indiana Insurance Co.*, 2015 IL App (1st) 140265, ¶ 35.

[3]Plaintiffs moved below to strike an affidavit executed by Herrera. The court did not rule on that motion, finding the affidavit did not affect the judgment. Contrary to plaintiffs' suggestion, it was their burden as movants, not defendants' burden, to obtain a ruling on their motion to strike. Under our *de novo* review, we are entitled to rely on that affidavit. Because the affidavit does not change the result, however, we similarly disregard it.

(West 2008); see also 820 ILCS 305/11 (West 2010) ("Compensation as Full Measure of Employer's Responsibility"). Additionally, this statute provides immunity to loaning and borrowing employers alike. *Chavez v. Transload Services, L.L.C.*, 379 Ill. App. 3d 858, 862 (2008). Furthermore, section 5(a) renders coemployees immune from a common law negligence action. *Ramsey v. Morrison*, 175 Ill. 2d 218, 224 (1997). This is because the Act's purpose of placing the cost of accidents on the industry would be blunted if such costs were shifted from one employee to another. *Collier v. Wagner Castings Co.*, 81 Ill. 2d 229, 241 (1980).

¶ 15                                                    A. Estoppel

¶ 16    As a threshold matter, defendants assert that plaintiffs are judicially estopped from denying that the injuries occurred within the scope of their employment because plaintiffs took a contrary position by seeking and accepting workers' compensation benefits on the premise that their injuries had occurred within the scope of employment. In response, plaintiffs assert that judicial estoppel does not apply here because defendants failed to demonstrate that plaintiffs intended to deceive or mislead the court. Plaintiffs further assert that judicial estoppel does not apply because it was consistent to assert that the injuries occurred within the scope of their employment with Express but not within the scope of any employment with Radio.

¶ 17    In order for judicial estoppel to apply, the trial court must first determine that the party to be estopped has taken two factually inconsistent positions in separate judicial or quasi-judicial administrative proceedings. *Seymour v. Collins*, 2015 IL 118432, ¶ 47. Additionally, the court must determine that the party intended for the trier of fact to accept the truth of the facts alleged and that the party received some benefit from the initial proceeding. *Id.* Even if the foregoing factors are established, however, the party's conduct may reflect inadvertence, rather than an intent to deceive. *Id.* Accordingly, the trial court must then exercise its discretion to determine whether judicial estoppel should bar the action. *Id.*

¶ 18    While defendants' pleadings below effectively noted the disingenuous nature of plaintiffs' contention that their injuries occurred outside the scope of employment, defendants did not specifically raise "judicial estoppel." *Vance v. Wentling*, 249 Ill. App. 3d 867, 872 (1993) (observing that issues not raised in the trial court cannot be argued for the first time on appeal). Additionally, the trial court did not use that term and, contrary to defendants' assertion, it is not clear that the court found the requisite factors were present. Similarly, the record does not clearly show that the court, in its discretion, decided that judicial estoppel was warranted.

¶ 19    Nonetheless, our supreme court has held that when an employee who was injured by a coemployee has collected compensation under the Act, he cannot then assert that his injuries fell outside of the Act. *Collier*, 81 Ill. 2d at 241. In so holding, the court recognized the need to prevent not only double recovery, but the proliferation of litigation as well. *Id.* at 241-42. Thus, where a plaintiff has collected workers' compensation pursuant to a settlement agreement, he is precluded from filing a civil action for damages. *Id.*; see also *Fregeau v. Gillespie*, 96 Ill. 2d 479, 481, 486 (1983) (where the plaintiff had already filed for and received workers' compensation, his civil action against his coemployee was barred); *Rhodes v. Industrial Comm'n*, 92 Ill. 2d 467, 471 (1982) (observing that "[t]he legislative intention underlying section 5 of the [Act] would obviously be frustrated if an injured employee could recover damages in a common law action and workmen's compensation benefits as well"). Furthermore, the appellate court has had numerous opportunities to apply this holding. *Locasto*

*v. City of Chicago*, 2016 IL App (1st) 151369, ¶ 16; *Marquez v. Martorina Family, LLC*, 2016 IL App (1st) 153233, ¶ 14; *Glasgow v. Associated Banc-Corp*, 2012 IL App (2d) 111303, ¶¶ 16, 22; *Hall v. DeFalco*, 178 Ill. App. 3d 408, 414 (1988). We note that neither *Collier*, *Fregau*, nor *Rhodes* expressly mentioned judicial estoppel, however, or any requirement that a party intend to deceive a judicial body.

¶ 20    Based on the aforementioned case law, it appears that section 5 of the Act, which defendants clearly raised below, created its own form of estoppel, albeit not *judicial* estoppel as defined in *Seymour*. See *Wren v. Reddick Community Fire Protection District*, 337 Ill. App. 3d 262, 267 (2003) (finding that the application and acceptance of benefits does not transform an individual into an employee but nonetheless "acts as a form of estoppel, denying a plaintiff who has availed herself of the benefits of the Act from thereafter asserting that she falls outside its reach"). Accordingly, the elements of judicial estoppel do not control our determination, notwithstanding prior case law characterizing this procedural hurdle as one of judicial estoppel. See, *e.g.*, *Mijatov v. Graves*, 188 Ill. App. 3d 792, 796 (1989).

¶ 21    Nonetheless, plaintiffs' argument suggests that no form of estoppel should apply here because they could claim to be employees of Express without acknowledging that Radio constituted a borrowing employer. Thus, plaintiffs suggest that the Act's exclusivity provision and corresponding estoppel does not bar their action against defendants. But see *Wren*, 337 Ill. App. 3d at 267 (finding that the application and acceptance of benefits does not transform a nonemployee into an employee but nonetheless "acts as a form of estoppel"). Contrary to plaintiffs' assertion, the record clearly shows they were Radio's borrowed employees, and thus, their acceptance of workers' compensation benefits precluded them from seeking further payment from Radio or Herrera, their coemployee.

¶ 22                                    B. Borrowed Employee

¶ 23    An employee who is generally employed by one person may be loaned to another person to perform special work and, while performing the special work, become the employee of the person to whom he has been loaned. *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341, 346-47 (1980). To determine whether an employee has been borrowed, courts must determine (1) whether the special employer had the right to direct and control the manner of the employee's work and (2) whether a contract of hire, express or implied, existed between the employee and the special employer. *Id.* at 348. Additionally, the loaned-employee concept was codified in the Act. *Chaney v. Yetter Manufacturing Co.*, 315 Ill. App. 3d 823, 826 (2000). Section 1(a)(4) of the Act states as follows:

> "Where an employer operating under and subject to the provisions of this Act loans an employee to another such employer and such loaned employee sustains a compensable accidental injury in the employment of such borrowing employer and where such borrowing employer does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act and as to such employee the liability of such loaning and borrowing employers is joint and several, provided that such loaning employer is in the absence of agreement to the contrary entitled to receive from such borrowing employer full reimbursement for all sums paid or incurred pursuant to this paragraph ***.
>
>          ***

An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section." 820 ILCS 305/1(a)(4) (West 2010). Although the question of whether an employee was borrowed generally constitutes a question of fact, the question is one of law where facts are undisputed and subject to only one reasonable inference. *Chaney*, 315 Ill. App. 3d at 827.

¶ 24 Several factors indicate that a borrowing employer had the right to direct and control the manner of the employee's work: (1) the employee worked the same hours as the borrowing employer; (2) she received instructions from the borrowing employer's employees; (3) the loaning employer's supervisors were not at the work site; (4) the borrowing employer told the employee when to start and stop working; and (5) the loaning employer relinquished its equipment to the borrower. *Prodanic*, 2012 IL App (1st) 110993, ¶ 16. Courts have also considered whether the purported borrowing employer could dismiss the employee from service at its worksite, notwithstanding that the borrowing employer could not discharge the employee from her employment with the loaning employer. *Id.* The fact that an employee does not receive wages from the special employer does not alone defeat a finding that he was a loaned-employee. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349.

¶ 25 Here, even when viewed in the light most favorable to plaintiffs, the record supports only the determination that Radio had the right to direct and control the manner of plaintiffs' work. First, we observe that plaintiffs conflate the issue of whether Radio was their borrowing employer with the scope of employment issue. These distinct legal issues must be separately addressed. Indeed, plaintiffs themselves demonstrate the significance of this legal distinction by stating that "[h]ad the injuries occurred at the Chicago warehouse, between the hours of 8:30 a.m.—4:00 p.m., while the Plaintiffs were assembling wagons or performing other warehouse tasks, the Defendants arguments would be correct." Radio either was, or was not, plaintiffs' borrowing employer. Radio's status as such did not evaporate and rematerialize everyday between the hours of 4 p.m. and 8:30 a.m.

¶ 26 Morales testified that Herrera was her supervisor at Radio. Sanchez similarly testified that Herrera told her what to do and how to do it. Although work was generally from 8:30 a.m. to 5 p.m., Sanchez testified that Herrera told her when to start and stop working. According to Herrera and Bastuga, Herrera determined plaintiffs' duties, schedules, and responsibilities and could determine whether plaintiffs' work should be stopped or terminated. Furthermore, Ryan testified that Herrera supervised plaintiffs and that Radio had the right to control and direct the manner in which they performed their work for Radio. While Ryan also testified that she was plaintiffs' supervisor, Ryan's role did not foreclose Herrera from being their supervisor while working for Radio. Indeed, Express's staffing agreement provided that Radio would supervise, direct, and control the work of Express employees. In contrast, Express had no supervisors at the work site.

¶ 27 Moreover, Ryan testified that she expected plaintiffs to comply with Radio's policies while at its work site. Although plaintiffs observe that those polices required temporary employees to bring issues regarding their employment with Express to the attention of Express, Radio did not prevent such employees from raising issues regarding their work at Radio with its own

supervisors. Additionally, Ryan testified that Radio could remove an Express employee for violating one of Radio's policies, notwithstanding that Ryan might try to persuade Radio not to do so, and that Radio could not otherwise discipline Express employees. Radio had the right to discharge plaintiffs from its facility. It did not need to demonstrate the right to discharge plaintiffs from their positions with Express.

¶ 28    Contrary to plaintiffs' suggestion, Morales's testimony that Express, rather than Radio, was her employer, does not change the result. Her personal definition of an "employer" has no bearing on whether Radio was her employer as defined under Illinois law. As stated, Express's payment of plaintiffs' wages does not prevent Radio from being a borrowing employer either. See *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349. To the extent plaintiffs argue that the collision occurred outside the confines of Express's contract with Radio, this does not negate the undisputed evidence that Radio generally had the right to control and direct the manner of work plaintiffs performed for Radio. See *Prodanic*, 2012 IL App (1st) 110993, ¶ 18 (finding the record only reasonably permitted the inference that the worker was a borrowed employee where deposition testimony showed employer had the right to control the manner of his work). At best, this reflects a potential contractual dispute between Express and Radio, not plaintiffs' employment status for purposes of the Act.

¶ 29    We are unpersuaded by plaintiffs' reliance on *Trenholm v. Edwin Cooper, Inc.*, 152 Ill. App. 3d 6, 9 (1986), where the reviewing court found issues of fact existed regarding the defendant's right to control the plaintiff's work. There, the plaintiff was sent to the defendant's premise by his general employer. While there, the defendant's employees would tell the plaintiff *what* tasks needed to be done, but the plaintiff was responsible for telling his employer's other employees on the defendant's premises *how* to perform each task. *Id.* at 8-9. Additionally, evidence was conflicting regarding whether the defendant had the right to hire, fire, or supervise the plaintiff and his fellow employees. *Id.* at 9-10.

¶ 30    In contrast, here, Radio told plaintiffs how to perform their tasks. Additionally, Radio ultimately had the right to prevent plaintiffs from working on its premises, the equivalent of discharge. Thus, the record before us presents no such factual dispute.

¶ 31    The record also clearly shows that plaintiffs had an implied contract for hire with Radio. In order to demonstrate that a contract existed, the employee must have at least implicitly acquiesced in that relationship. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 350. Additionally, implied consent is established where the employee knows that the borrowing employer is generally in charge of, and controls, her performance. *Crespo v. Weber Stephen Products Co.*, 275 Ill. App. 3d 638, 641 (1995). Similarly, the employee's acceptance of direction shows her acquiescence to her relationship with the employer. *Prodanic*, 2012 IL App (1st) 110993, ¶ 17.

¶ 32    Plaintiffs willingly went to Radio, even prior to the day of the collision, and accepted directions from Herrera. When Herrera told plaintiffs to be in Radio's Chicago parking lot in order to be transported to Elwood, plaintiffs did so. Regardless of whether Herrera instructed plaintiffs to ride with him or merely offered them a ride, the record clearly shows that he directed plaintiffs to go to Elwood and, in response, they set out to go there. See *A.J. Johnson Paving Co.*, 82 Ill. 2d at 350 (finding acquiescence to an employment relationship where (1) the claimant was aware that the job was being performed by the special employer, and (2) the claimant accepted the special employer's control over his work by complying with the foreman's instructions); *Chavez*, 379 Ill. App. 3d at 863 (finding that the plaintiff implicitly consented to the borrowed employment relationship where he accepted his assignment with

that entity and its control and direction of his work); see *Crespo*, 275 Ill. App. 3d at 641-42 (finding the plaintiff's consent was demonstrated when he appeared at the defendant's facility and responded to instructions of the defendant's supervising employee). While plaintiffs argue that Ryan testified no contract was executed between plaintiffs and Radio, her testimony shows only that plaintiffs did not form a written contract with Radio.

¶ 33 Moreover, the agreement between Radio and Express has no bearing on plaintiffs' implied contract for hire with Radio. As our supreme court stated in *A.J. Johnson Paving Co.*, the loaned employee concept depends on a contract of hire "between the employee and the special employer," not the details of the contract between the two employers. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 348. Thus, the employee's consent is the focus of the second prong of the borrowed employee test. The record does not demonstrate, however, that plaintiffs were aware of staffing agreement's terms. Thus, that agreement could not have limited the terms of plaintiffs' consent to an employment relationship with Radio. While Express may or may not have a claim for reimbursement against Radio based on the Act or their contract, that matter is entirely separate from whether plaintiffs and Radio had an implied contract for hire. See *Chaney*, 315 Ill. App. 3d at 826-27 (observing that between employers, the borrowing employer has primary liability, while the loaning employer has secondary liability).

¶ 34 Having determined that Radio was plaintiffs' borrowing employer and that plaintiffs have already received workers' compensation payments through Express, plaintiffs are clearly estopped from denying that their injuries fell outside the Act. Estoppel aside, we nonetheless observe that a trier of fact could find only that their injuries fell within the scope of employment.

¶ 35                                              C. Scope

¶ 36 An employee traveling to or from work is generally not within the scope of employment. *Pyne*, 129 Ill. 2d at 356; *Hall*, 178 Ill. App. 3d at 413. This is because the employee's travel results from his own decision where to live, a matter which is ordinarily of no interest to her employer. *Hindle v. Dillbeck*, 68 Ill. 2d 309, 318 (1977). An exception exists, however, where an employer causes its employee to travel away from a regular workplace or where the employee's travel is partly for her employer's purposes, rather than for the purpose of conveying the employee to or from the regular workplace. *Pyne*, 129 Ill. 2d at 356.

¶ 37 Here, the accident occurred while plaintiffs were en route to a distant location not of their choosing for the benefit of Radio. Additionally, plaintiffs willingly appeared early at work by 7 a.m. Regardless of Express's expectations with respect to the work site and work hours, plaintiffs were in Herrera's car for the benefit of Radio, their borrowing employer, when the collision occurred. Compare *Hindle*, 68 Ill. 2d at 319-20 (finding that the car accident occurred within the course of employment where the employer provided transportation for its crew as a business necessity, the foreman was authorized to pay the crew for time spent in travel, no public transportation was available, the worksites and hours varied, and the employees depended on the employer to provide transportation), *Sjostrom v. Sproule*, 33 Ill. 2d 40, 44 (1965) (where the coemployees' car accident occurred while en route to a different location to which they were assigned on a temporary basis, and thus, it was not contemplated that they should change their place of residence, the employees were traveling to accommodate their employer), and *Hall*, 178 Ill. App. 3d at 413 (finding "the fact that plaintiff had punched out of work" and that the defendant did not show the plaintiff was required to ride with his

coemployee did not permit an inference that the collision occurred outside the scope of employment), with *Moran v. Tomita*, 54 Ill. App. 3d 168, 170-71 (1977) (finding that the undisputed facts presented at trial permitted conflicting inferences as to whether injuries arose out of the parties' employment where the employer did not require its employees to travel to another location, did not pay for transportation, and gave no instructions regarding the trip).

¶ 38                                  III. CONCLUSION

¶ 39      Plaintiffs were the employees of both Express and Radio. The record supports no other determination. Having already sought and received workers' compensation benefits through Express, plaintiffs are not entitled to further damages from Radio or Herrera, their coemployee. Furthermore, the record supports only the inference that the injuries occurred within the scope of their employment. Accordingly, the trial court properly entered summary judgment in favor of defendants.

¶ 40      For the foregoing reasons, we affirm the trial court's judgment.

¶ 41      Affirmed.