2020 IL App (2d) 190877WC-U
No. 2-19-0877WC
Order Filed October 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

Workers' Compensation Commission Division
_____

| | | |
|---|---|---|
| ROCK SOLID STABILIZATION AND RECLAMATION, INC., | ) ) ) | Appeal from the Circuit Court of McHenry County, Illinois |
| Appellant, | ) ) | |
| v. | ) ) | No. 18-MR-392 |
| THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* | ) ) ) | Honorable |
| | ) | Thomas A. Meyer, |
| (David Dripps and Super Mix, Appellees). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Hoffman, Hudson, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The Commission's determination that Rock Solid was a borrowing employer was not against the manifest weight of the evidence.

¶ 2                                 I. INTRODUCTION

¶ 3   Rock Solid Stabilization and Reclamation, Inc. (Rock Solid), appeals a decision of the Illinois Workers' Compensation Commission (Commission) finding that it was a borrowing employer and awarding the claimant and borrowed employee, David Dripps, benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)). The Commission

affirmed and adopted the decision of the arbitrator. Rock Solid sought review before the circuit court of Sangamon County. The court confirmed the Commission's decision. Rock Solid appeals.

¶ 4                                    II. BACKGROUND

¶ 5     The following factual recitation is taken from the evidence presented at the arbitration hearing conducted before Arbitrator Gregory Dollison on April 27, 2017. We limit our discussion of the facts to those pertaining to the employer-employee relationship.

¶ 6     The claimant testified that he was employed by Super Mix as a truck driver. He had been employed as a truck driver for 16 years and began working for Super Mix in June 2011. Shortly thereafter, Super Mix sent the claimant on an out-of-state job in Nebraska. In August 2011, Super Mix dispatcher, Tommy, asked the claimant to go to North Dakota with another Super Mix driver to haul cement for Rock Solid. The job required the claimant to make daily runs to ship cement to a construction site from South Dakota to North Dakota. The evidence presented demonstrated that Super Mix was owned by Jack Pease and Rock Solid was owned by Jack's son, Jonathan Pease.

¶ 7     The claimant stated that he would learn his day-to-day dispatch orders the night before by a Rock Solid driver who was staying at the motel, and he worked close to the same hours as Rock Solid employees. He stated that Tommy at Super Mix did not provide his orders as he "didn't know what was going on out there," but that he would speak with Tommy to talk about how the day went. The claimant explained that he would follow Rock Solid's lead driver during the delivery process with each delivery run. When he arrived at the job site, he would follow Rock Solid's lead driver and wait for direction to transfer his load from his truck to Rock Solid's truck that was designed to accept the cement. The claimant stated he spent up to 12 hours per day over the road driving and about 1 to 2 hours waiting at the job site to take specific direction as to where to deliver the load. He stated that laborers, Rock Solid drivers, or Jonathan himself told him what to do. The

claimant also stated that no Super Mix supervisors were present, and in addition to the Super Mix trucks driven by the claimant and the other Super Mix driver, he stated there was a third Super Mix truck at the jobsite, which he believed was driven by a Rock Solid employee.

¶ 8     On September 28, 2011, while on his way to Rapid City, South Dakota, the claimant was driving on the road when the truck caught a gust of wind. His truck hit a semi moving the opposite direction. He ended up in a ditch and injured his left foot. The accident was reported to Tommy at Super Mix through the claimant's brother. At the time of the accident, he was driving a Super Mix truck, he was paid by Super Mix, and Super Mix covered his lodging expenses. The claimant never received any compensation from Rock Solid. The claimant's Application for Adjustment of Claim named both Super Mix and Rock Solid as his employers.

¶ 9     Jonathan testified that he was the owner of Rock Solid. He never paid the claimant for any work while on the job and saw him one time a day for about a half hour. Jonathan stated that a Rock Solid employee would tell the claimant where to park and where to go next. He stated that no one at Rock Solid had authority to terminate or discipline the claimant. Additionally, the claimant did not drive any trucks owned by Rock Solid. Jonathan also provided that there was no agreement between Super Mix and Rock Solid. Jonathan agreed that he made initial contact with Jack to arrange for Super Mix to be present in North Dakota and that the claimant performed work activities similar to those his drivers performed. The truck the claimant drove was similar to Rock Solid's trucks and had the same functionality.

¶ 10     Jack testified that he was the owner of Super Mix and the claimant drove a semi-bulker trailer for him. In the Summer of 2011, he became aware of a project Rock Solid was doing for Rachel Contracting in North Dakota when Jonathan called him and asked for help. There were not enough bulkers in North Dakota to complete the job. He agreed to send at least two trucks to help

and instructed his dispatcher to find two drivers willing to go to North Dakota and make arrangements with Jonathan and Rachel Contracting as to what the drivers were supposed to do. There was no written documentation between Super Mix and Rachel Contracting or Rock Solid for this job. Jack stated that he only knew that Rock Solid needed help hauling to a jobsite from a cement terminal and he had a limited amount of control over the claimant when he or his dispatcher would direct the claimant to haul one load per day for five days minimum, and if the terminal was open Saturday, to try to get a sixth load. He said that either Rachel Contracting or Rock Solid told the claimant where to dump and what time to show up. Jack stated that he was paid for the claimant's work directly by Rachel Contracting. He also stated that Jonathan had no authority to terminate or discipline the claimant.

¶ 11    A "Certificate of Liability Insurance" was entered into evidence, which listed Rock Solid as the insured and Super Mix as the certificate holder. The certificate provided that Rock Solid had, among other things, "workers' compensation and employers' liability" coverage between November 15, 2010, and November 15, 2011.

¶ 12    A written agreement between Rachel Contracting as general contractor and Rock Solid as subcontractor was also entered into evidence. The agreement provided that subcontractors shall not assign any of the work without prior written approval of Rachel Contracting. The agreement also provided how much Super Mix would be paid, however, Super Mix was not a party to the contract. The contract does not mention any other brokers other than Rock Solid and Super Mix.

¶ 13    The arbitrator found that Super Mix was a lending employer and Rock Solid was a borrowing employer. The arbitrator made the following findings: (1) there was a contract of hire, either express or implied, between the claimant and Rock Solid; (2) the claimant's acceptance of Rock Solid's direction demonstrated his acquiescence to the employee relationship; (3) the

claimant worked essentially the same hours as Rock Solid employees; (4) the claimant received daily dispatch orders the night before at the motel from a Rock Solid employee, and at the worksite, he received his orders from a Rock Solid employee; (5) it was undisputed that no Super Mix supervisors were present at the worksite in North Dakota; (6) Rock Solid told the claimant when to start and stop working; (7) Super Mix relinquished its equipment to Rock Solid, which included the use of a Super Mix truck by a Rock Solid employee; (8) Rock Solid had trucks similar to the one the claimant drove at the jobsite; (9) Jonathan acknowledged there was a general need for trucks at the jobsite and he initiated contact with his father to procure additional trucks; and (10) the contract between Rachel Contracting and Rock Solid is the only documentation providing how Super Mix would be paid. The arbitrator also found that the claimant sustained an accident arising out of and in the course of his employment with Rock Solid and that his condition of ill-being was causally related to the accident. Accordingly, the claimant was awarded benefits under the Act.

¶ 14    Rock Solid filed a petition to review the arbitrator's decision before the Commission. The Commission affirmed and adopted the decision of the arbitrator. Rock Solid then sought review of the Commission's decision before the circuit court, which the court confirmed. Rock Solid appeals.

¶ 15                                III. ANALYSIS

¶ 16    The sole issue Rock Solid presents on appeal is whether the Commission's decision that the claimant was its borrowed employee is against the manifest weight of the evidence. It argues that Super Mix should be responsible for the claimant's workers' compensation claim.

¶ 17    An employer-employee relationship is required for benefits under the Act. *Skzubel v. Illinois Workers' Compensation Comm'n*, 401 Ill. App. 3d 263, 268 (2010). "An employee who is generally employed by one person may be loaned to another person to perform special work and,

while performing the special work, become the employee of the person to whom he has been loaned." *Morales v. Herrera*, 2016 IL App (1st) 153540, ¶ 23. This type of employer-employee relationship was codified in section 1(a)(4) of the Act and provides, in relevant part, as follows:

"Where an employer operating under and subject to the provisions of this Act loans an employee to another such employer and such loaned employee sustains a compensable accidental injury in the employment of such borrowing employer and where such borrowing employer does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act and as to such employee the liability of such loaning and borrowing employers is joint and several, provided that such loaning employer is in the absence of agreement to the contrary entitled to receive from such borrowing employer full reimbursement for all sums paid or incurred pursuant to this paragraph together with reasonable attorneys' fees and expenses in any hearings before the Illinois Workers' Compensation Commission or in any action to secure such reimbursement. Where any benefit is provided or paid by such loaning employer the employee has the duty of rendering reasonable cooperation in any hearings, trials or proceedings in the case, including such proceedings for reimbursement.

\*\*\*

An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they

are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section." 820 ILCS 305/1(a)(4) (West 2010).

¶ 18    The parties agree that the framework our supreme court provided in *A.J. Johnson Paving Co. v Industrial Comm'n*, 82 Ill. 2d 341, 348 (1980), controls the issue before us. In determining whether a borrowing employee status exists, the inquiry is two-fold: (1) whether the alleged borrowing employer had the right to direct and control the manner in which the claimant performed the work and (2) whether a contract of hire existed between the claimant and the alleged borrowing employer. *Id.* This presents a question of fact to be determined by the Commission. *Id.* A factual finding by the Commission will not be set aside on appeal unless it is against the manifest weight of the evidence. *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315 (2009). A finding of fact is against the manifest weight of the evidence when an opposite conclusion is clearly apparent. *Gross v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100615WC, ¶ 21. The appropriate test for our review is whether the evidence in the record is sufficient to support the Commission's determination—not whether this court or another tribunal might have reached an opposite conclusion. *Pietrzak v. Industrial Comm'n of Illinois*, 329 Ill. App. 3d 828, 833 (2002).

¶ 19    We first address whether Rock Solid had the right to direct and control the manner in which the claimant performed the work. Aside from providing our analytical framework for this issue, we find the facts and the supreme court's determination in *A.J. Johnson* instructive. The claimant in that case worked as a heavy equipment operator for 18 years, and he had been employed by DeMarr Asphalt for 6 years prior to the date of the accident. *A.J. Johnson*, 82 Ill. 2d at 344. DeMarr paid the claimant, tracked his hours, determined where and when he worked, determined his right to take time off work, and had the authority to lay off or discharge the claimant. *Id.* DeMarr owned

four asphalt paving machines, one for each of the operators it employed. *Id.* at 345. When an asphalt order exceeded a certain tonnage, DeMarr would provide the purchaser, free of charge, with an asphalt paving machine and an operator for the laying of the asphalt. *Id.*

¶ 20    DeMarr was contacted by a representative of A.J. Johnson who requested DeMarr provide a certain amount of asphalt and a paving machine for a jobsite. *Id.* Since the amount of asphalt exceeded a certain tonnage, DeMarr agreed to supply the paving machine and lay the asphalt without additional charge. *Id.* He contacted the claimant and directed him to report to the A.J. Johnson job site the next morning and informed him what equipment would be on the site and the quantity of the asphalt to be laid. *Id.* The next morning, the claimant went to the location. DeMarr's paving machine was transported to the jobsite by a truck owned by A.J. Johnson; no DeMarr employees, other than the claimant, were present at the jobsite; and the claimant reported to A.J. Johnson's employee, Hardt, who was the job foreman. *Id.*

¶ 21    The claimant asked Hardt where he should start laying asphalt and took his direction. *Id.* at 346. The claimant was in full control and operation of the paving machine and was assisted by A.J. Johnson's laborers who would operate the thickness-control screws located on the rear of the paving machine. *Id.* However, the claimant did not have the authority to direct A.J. Johnson's employees as to their job performance. *Id.* Hardt was empowered to determine the employees' work hours and when breaks would be taken. *Id.* The claimant often took his breaks with the A.J. Johnson employees since he needed aid in operating the thickness control on the paving machine. *Id.* The claimant reported to work and was dismissed for the day when directed by Hardt. *Id.* Although Hardt did not have control over the actual operation or maintenance of the equipment, he was empowered to direct the claimant to start or stop the paving machine. *Id.* If Hardt was not satisfied with the laying of the asphalt, he was empowered to instruct the operator to relay the

asphalt. *Id.* That same day the claimant reported for his first day of paving with A.J. Johnson, he sustained an injury shortly after commencing the paving operation.

¶ 22    The court found the following facts relevant in deciding whether A.J. Johnson had the right to direct and control the manner in which the claimant performed the work:

"First, there was sufficient evidence for the Commission to infer that Johnson had the right to control the manner of the work performed. Claimant worked the same hours as the Johnson laborers; he received instructions from Hardt, the Johnson foreman; no supervisors from DeMarr were present; claimant was assisted by laborers employed by Johnson; and Hardt was empowered to direct the claimant when to start, stop or repave. The fact that claimant's skill as an operator allowed him to exercise control over the paving machine and the technical details of the paving operation was insufficient to preclude a finding that Johnson had the right to control the manner of the work. [Citation.] Nor do we deem relevant the fact that claimant received his salary from DeMarr Asphalt. The mere fact that the employee does not receive his wages from the [alleged borrowing] employer will not defeat the finding of a loaned-employee situation. [Citations.] In addition to finding control over the method of claimant's work, the Commission could properly infer that DeMarr Asphalt relinquished control over its equipment to Johnson. The paving machine was delivered to the site by a Johnson-owned truck, and claimant was the only DeMarr employee sent to the job site to operate the machine. In *M.W.M. Trucking Co. v. Industrial Comm'n,* 62 Ill. 2d 245, 255 (1976), the fact that control of the equipment was surrendered to the [alleged borrowing] employer was deemed to be an important factor in upholding the Commission's finding that there existed a loaned-employee relationship. Thus, the

Commission could properly infer that DeMarr relinquished control over both the manner of doing work and the equipment to Johnson." *Id.* at 349-50.

¶ 23    The facts in the case at bar are very similar to those presented in *A.J. Johnson*. The evidence showed that the claimant received his daily dispatch orders the night before from a Rock Solid employee who was staying at the same motel, and he worked essentially the same hours as Rock Solid's employees. He would follow Rock Solid's lead driver during the delivery process with each delivery run, and when he arrived at the jobsite, he would follow Rock Solid's lead driver and wait for direction to transfer his load from his truck to Rock Solid's truck that was designed to accept the cement. The claimant stated that laborers onsite, Rock Solid drivers, or Jonathan himself told him what to do. It is undisputed that no supervisors from Super Mix were present. Both Jonathan and Jack testified that Rock Solid was not empowered to discipline or terminate the claimant. Although the claimant appeared to have contact with Super Mix's dispatcher, Tommy, he stated that Tommy did not provide his orders and "didn't know what was going on out there."

¶ 24    The evidence demonstrated that Super Mix relinquished three trucks to Rock Solid. Two of those trucks were operated by the claimant and another Super Mix driver. The claimant stated that he believed that the third truck was driven by a Rock Solid employee. The evidence also established that the claimant was paid directly by Super Mix. However, the fact that he did not receive his wages from Rock Solid does not alone defeat a finding that he was a loaned employee. *Morales*, 2016 IL App (1st) 153540, ¶ 24. In fact, the claimant in *A.J. Johnson* was not paid by the borrowing employer either. *A.J. Johnson*, 82 Ill. 2d at 344.

¶ 25    Both Jack and Jonathan testified that Rock Solid had no authority to terminate or discipline the claimant. Rock Solid heavily relies on this factor. Although Rock Solid may not have had authority to discharge the claimant, it could have refused to allow the claimant to haul further

loads, which implies the power to discharge or terminate employment. *Fransen Construction Co. v. Industrial Comm'n*, 384 Ill. 616, 627-28 (1943). Regardless, the authority to discharge is not dispositive and is only one of the factors considered when determining an employer's responsibility. *REO Movers, Inc. v. Industrial Comm'n*, 226 Ill. App. 3d 216, 221 (1992).

¶ 26 Based on the foregoing, we find that this issue is clearly controlled by *A.J. Johnson*. The parties argue the applicability of *Fransen*, but we find that case factually distinguishable. *Fransen*, 384 Ill. 616 at 627-28 (the alleged borrowing employer provided payment to the alleged lending employer for the worker's service and the worker reported to the alleged lending employer). Here, there was sufficient evidence of record for the Commission to find that Rock Solid had the right to control the manner of the work performed by the claimant.

¶ 27 Last, we address whether a contract for hire existed between the claimant and Rock Solid. "In order to establish such a contract there must be at least an implied acquiescence by the employee in the relationship." *A.J. Johnson*, 82 Ill. 2d at 350. In *A.J. Johnson*, the supreme court found that acquiescence could be established by the fact that the claimant was aware that the paving job was performed by A.J. Johnson and by the fact that he accepted A.J. Johnson's control over the work in that he followed the foreman's instruction regarding when to start and stop, where to start paving, and other incidental directions as to the performance of the work. *Id.*

¶ 28 The same can be said as to the case before us. Although there was no written agreement between Jack and Jonathan, they both testified regarding the arrangement. The claimant acquiesced as he was aware that he was completing work for Rock Solid, and he accepted Rock Solid's control over his work. The evidence showed that a Rock Solid driver provided the claimant with his daily dispatch orders, he followed a Rock Solid driver when in transit, and he waited for

Rock Solid's direction at the jobsite. Therefore, we find that there was sufficient evidence of record for the Commission to find that a contract for hire existed between the claimant and Rock Solid.

¶ 29    As a final matter, we note that evidence was presented during the proceedings that Rock Solid tendered a "Certificate of Liability Insurance" to Super Mix indicating that it carried workers' compensation coverage on the relevant date at issue. However, neither party cites any authority on the weight of this certificate for our analysis. As such, the certificate was not a factor in reaching our decision just as it was not a factor mentioned by the Commission in its decision.

¶ 30    Thus, we find that the Commission's determination that Rock Solid was a borrowing employer was not against the manifest weight of the evidence.

¶ 31                                IV. CONCLUSION

¶ 32    For the foregoing reasons, we affirm the judgment of the circuit court of McHenry County, which confirmed the Commission's decision.

¶ 33    Affirmed.