# Illinois Official Reports

## Appellate Court

---

### *Holten v. Syncreon North America, Inc.*, 2019 IL App (2d) 180537

---

| | |
|---|---|
| Appellate Court Caption | DELLACE C. HOLTEN JR., Plaintiff-Appellant, v. SYNCREON NORTH AMERICA, INC.; MARION SAPRON; ANDROID INDUSTRIES-BELVIDERE, LLC; COBALT INDUSTRIAL REIT; TOVAR SNOW PROFESSIONALS, INC.; and CORPORATE EMPLOYMENT SERVICES, INC., Defendants (Android Industries-Belvidere, LLC, Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-18-0537 |
| Filed | May 31, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 13-L-4; the Hon. John H. Young, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Timothy J. Lowery, of Lowery & Associates, LLC, of Barrington, for appellant.<br><br>Nicholas Johnson and Terrence F. Guolee, of Querrey & Harrow, Ltd., of Chicago, for appellee. |

Panel      JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Dellace C. Holten Jr., appeals from the trial court's orders granting summary judgment in favor of defendant, Android Industries-Belvidere, LLC (Android), and denying plaintiff's motion to vacate and reconsider. The trial court held that plaintiff's personal-injury action was barred by the exclusive-remedy provision of the Workers' Compensation Act (Act) (820 ILCS 305/5(a) (West 2012)) because there was no genuine issue of material fact with respect to the existence of a borrowed-employee relationship, as set forth in section 1(a)(4) of the Act (*id.* § 1(a)(4)), pursuant to which Staff on Site, Inc. (Staff on Site), a temporary staffing agency, sent plaintiff to work at Android. Plaintiff argues on appeal that summary judgment should have been granted in his favor on Android's exclusive-remedy defense because it was undisputed that Android neither paid plaintiff's workers' compensation insurance premiums or benefits nor was obliged to reimburse Staff on Site for the expenses. Alternatively, plaintiff argues that there were, at a minimum, genuine issues of material fact as to whether a borrowed-employee relationship existed. For the reasons set forth below, we affirm.

¶ 2               I. BACKGROUND

¶ 3    The following is derived from the pleadings, depositions, and affidavits on file. Android, a manufacturer, contracted with Staff on Site for the provision of temporary employees. As pertinent to the issue here, the contract between Android and Staff on Site provided:

> "1. Staff On Site and Client agree that Staff On Site will provide temporary employees ('Employees') for Client. Client agrees that it will pay for said employees at the rate set forth in the attached proposal which, from time to time, may be amended by both parties in writing.

> 2. Client agrees that Staff On Site's obligation to Client is limited to assigning employees ('Employees') with certain skills and abilities; maintain personnel and payroll records; calculate and pay wages; withhold and remit payroll taxes and other government-mandated charges (including worker[s'] compensation); hire, assign, reassign, counsel, discipline and discharge Employees and to be responsible for and handle work-related claims and complaints. Client further agrees to notify Staff On Site of any placement of employees working in conjunction with any Government Contract."

It was undisputed that Staff on Site maintained the requisite workers' compensation insurance.

¶ 4    Staff on Site hired plaintiff in approximately October or November 2011 and assigned plaintiff to Android's industrial facility in Belvidere as a forklift operator. Plaintiff alleged that on January 20, 2012, he sustained injuries when the forklift he was operating at Android fell from inside a tractor-trailer as the tractor-trailer moved away from a loading dock.

¶ 5 Plaintiff filed a workers' compensation claim against Android. However, Android directed plaintiff to file the claim against Staff on Site. Accordingly, plaintiff filed the claim against Staff on Site and received workers' compensation benefits.

¶ 6 Plaintiff then filed this lawsuit against Android and other entities (none of which is a party to this appeal).[1] The operative complaint alleged negligence against Android. Android filed affirmative defenses, including that, because it was a borrowing employer under section 1(a)(4) of the Act (*id.*), plaintiff's claims were barred by the exclusive-remedy provision of the Act (*id.* § 5(a)). The parties filed cross-motions for summary judgment on the exclusive-remedy defense. The evidence submitted with the motions included the deposition testimony of plaintiff and Brian Brown (Android's human resources manager), a verified statement from plaintiff, an affidavit from Brown, the contract between Android and Staff on Site, and the correspondence from Android redirecting plaintiff's workers' compensation claim.

¶ 7 At Brown's deposition, regarding plaintiff's assignment to Android, Brown explained that Android had notified Staff on Site that Android "needed people with certain skill sets, and [plaintiff] was one of the people that they referred—that they sent over." Plaintiff was "presented to [Android] as being a very skilled, qualified material handler, forklift driver," and he passed a forklift test before Android allowed him to "drive on a regular production basis."

¶ 8 Brown further testified regarding plaintiff's work at Android:

"Q. You answered the questions about how [plaintiff] got on the Android property. You called Staff on Site or somebody called Staff on Site to send somebody over. They sent over [plaintiff], is that correct?

A. Correct.

Q. Once [plaintiff] was here, did he report to Android's facility every day or did he have to go first to Staff on Site and then come check in here?

A. No, he just came from home to here.

Q. Okay. And when he left Android's facility, did he have to go back to Staff on Site before he returned home?

A. No.

Q. Okay. While he was on Android's property, did Staff on Site have any insight or any input on how he did his job on the day-to-day basis?

A. No.

Q. Okay. Were there supervisors at Android that would tell [plaintiff] what to do on a daily basis[?]

A. Yeah.

Q. Before [plaintiff] would start his shift, would there be safety meetings or shift meetings before his shift[?]

A. Materials always had a startup meeting.

Q. Okay. The startup meeting, was any Staff on Site personnel at those startup meetings or were they just Android personnel and the temps that were sent over there[?]

---

[1]Staff on Site's workers' compensation carrier, Work First Casualty Company, intervened as subrogee of Staff on Site to receive reimbursement for sums paid in the workers' compensation action from any judgment or settlement plaintiff received in this action.

A. Just the people who were here on assignment.

Q. Okay. As far as the control over [plaintiff's] work, an Android supervisor would be controlling what he did and when he did it and how often he would do that?

A. Give him directions for the day?

Q. Yeah.

A. The assignments? It would be here, yeah, people from here."

Brown also explained that, when a temporary employee arrives, "we say okay, here's the equipment, here's the hours of work, here's what we want you to do. We provide the training and they do the job." Brown specified that Android owned or leased the equipment plaintiff used.

¶ 9 Regarding Android's ability to terminate a worker placed by Staff on Site, Brown testified that Android had the right to remove the worker from its facility and tell the worker to return to Staff on Site. Brown further testified:

"[W]e don't fire them. We can ask the staffing agency not to have them return and— because they're their employees, not ours. So we can say please, you know, have—end their assignment here, but—you know, it's a matter of semantics. We don't—I don't go out there and tell a temp that you're fired. We just notify the staffing agency to please not have them come back."

Brown acknowledged that Staff on Site could still send the worker back but explained that "at the very least the working relationship would end with the agency" and that Android might need to call the police if "somebody just keeps showing up." Brown surmised, "They could do it, but, like I said, it would get old in a hurry."

¶ 10 In his affidavit, Brown attested that plaintiff worked primarily the second shift at Android and that plaintiff's working hours were the same as those of other second-shift employees. In this regard, Brown attested that Android controlled plaintiff's starting time and ending time and had the discretion to give plaintiff fewer or more hours. Further, according to Brown's affidavit, Staff on Site did not have supervisors present at Android and plaintiff took direction from Android employees.

¶ 11 Plaintiff testified at his deposition about his placement at Android:

"Q. How [did] you become employed at Android Industries?

A. I never was employed there. I was employed for—through Staff on Site.

* * *

Q. Was your first and only placement by Staff on Site, Android Industries?

A. Yes."

¶ 12 Plaintiff further testified:

"Q. Staff on Site, at some point, told you that you could work at Android, is that correct?

A. Yes.

Q. And you agreed to go to Android to work as a forklift operator[?]

A. Yes."

¶ 13 Regarding his duties at Android, plaintiff testified that he "started off loading and unloading semis on the south side of the plant which would have been parts coming in and going out to supply the line." Plaintiff explained that his duties changed before the accident.

- 4 -

He testified that, "because [he] was such a good forklift driver, they trusted [him] with the engines and transmissions which is a little more complicated than your general forklift or your general material handling." Thus, "[a] day or two before the accident," his assignment changed to "engines and transmissions" and "they [took him] to the other side and gave [him] a day or two of kind of breaking [him] in back there of how things go."

¶ 14      Regarding the source of the change in his duties, plaintiff testified:

"Q. Okay. Who decided to change your work?

A. They did because—

Q. And that is going to be my question. Who is they?

A. They would be—His name is [*sic*] Mike and Wil.

Q. And—

A. Now, whether they got higher up. I don't know.

Q. Okay. And Mike and Wil, were they your supervisors while you were at Android?

A. They were who instructed me on what to do, yes.

Q. And who did Mike and Wil work for?

A. I am assuming Android."

¶ 15      Plaintiff was questioned about his understanding as to Android's ability to terminate him. Initially, plaintiff testified:

"Q. So you believe you were fired by Staff on Site or by Android?

A. By Staff on Site."

Plaintiff further testified, however, that at the time of the accident he was concerned that Android would terminate him. According to plaintiff, on the day of the accident, a supervisor at Android warned him that he would be terminated if he filed a workers' compensation claim. The following colloquy ensued:

"Q. If you didn't work for Android, why were you concerned that Android might fire you for making a workers' comp claim?

A. They can compel my employer to get rid of me.

Q. And that was your understanding, that Android could compel Staff on Site to get rid of you?

A. Yes."

¶ 16      In plaintiff's verified statement, he stated that prior to the accident he "was never told" that Android had the power to dismiss him from any employment, "was never told" that Android had the power to compel Staff on Site to dismiss him from his employment or from working at Android, and "was never told" that he "had to start or stop working when told by Android." Plaintiff also stated that, prior to the accident, he "did not believe that Android had the power to compel Staff on Site to dismiss [him] from employment at any location" and he "did not believe [that he] was employed by Android nor that Android controlled [his] work performance." Moreover, "[b]y the day of the accident, [plaintiff] worked independently, with less than a minute of instruction from Android."

¶ 17      Plaintiff further stated that he never received an employee handbook from Android, that he received instruction and assistance from both Android and Staff on Site employees when he worked at Android, and that he did not know if "Staff on Site had a greater say over who

worked at the Android facility than Android, as [he] did not know the full relationship between them." Plaintiff stated that Staff on Site told him to bring all employment issues, including scheduling issues, to Staff on Site and not to Android. Plaintiff stated that, after the accident, an Android supervisor told him that he would be terminated if he filed a workers' compensation claim, and he believed that Android "could compel Staff on Site to get rid of [him]." Moreover, after the accident, Brown "told [him] that only Staff on Site could hire [him] and dismiss [him], and that Android did not fire [him] and did not control whether [he] worked at Android."

¶ 18 Following a hearing on the parties' cross-motions for summary judgment, the trial court granted summary judgment in favor of Android. The trial court found no genuine issue of material fact with respect to Android's right to control and direct the manner of plaintiff's work. In doing so, it found that Staff on Site placed plaintiff at Android to drive a forklift, plaintiff worked the same hours as other Android employees, Android's employees supervised plaintiff, no Staff on Site supervisors worked at the Android facility, Android had the right to remove plaintiff from the Android facility, and Android provided the equipment plaintiff used. The trial court also found that "a borrowing employer need not have the power to dismiss the employee from his general employment, just the power to dismiss from the borrowed employment."

¶ 19 The trial court rejected plaintiff's argument that "there must be a payment of benefits as a prerequisite to apply the exclusive remedy under [s]ection 5(a)" (820 ILCS 305/5(a) (West 2012)). The trial court reasoned:

"Android and Staff on Site contracted for Staff on Site to provide workers' compensation coverage. The plaintiff has, apparently, filed a workers' compensation claim and has, apparently received benefits from Staff on Site, hence the interven[o]r. Here, as provided in [section] 1(a)(4), Android as a borrowing employer not providing or paying benefits is liable to the employee jointly and [severally]; however, the employee doesn't get two workers' compensation coverages or two workers' compensation recoveries."

Accordingly, the trial court concluded that Android was a borrowing employer under section 1(a)(4) of the Act (*id.* § 1(a)(4)) and entitled to the immunity set forth in the Act's exclusive-remedy provision.

¶ 20 Plaintiff moved to vacate and reconsider the trial court's grant of summary judgment in favor of Android. Following a hearing, the trial court denied the motion, reiterating its findings with respect to Android's right to control and direct the manner of plaintiff's work. The trial court also rejected plaintiff's "more strenuously argued" position "that Android not paying workers' compensation premiums is a 'threshold' to any immunity under [s]ection 5(a) of the Workers' Compensation Act." The trial court noted that section 1(a)(4) of the Act provides that the liability of loaning and borrowing employers is joint and several unless there is an agreement to the contrary. There was an agreement to the contrary here—"Android and Staff on Site contracted for Staff on Site to provide the workers' compensation coverage and [it], in fact did." Thus, Android was a borrowing employer under section 1(a)(4) and entitled to immunity under the Act's exclusive-remedy provision.

¶ 21 Plaintiff timely appealed.

II. ANALYSIS

¶ 23 Plaintiff argues that summary judgment on the exclusive-remedy defense should have been entered in his favor because it was undisputed that Android neither paid plaintiff's workers' compensation premiums or benefits nor was obliged to reimburse Staff on Site for the expenses. Alternatively, plaintiff argues that, at a minimum, there were genuine issues of material fact as to whether a borrowed-employee relationship existed. We disagree.

¶ 24 We note as a preliminary matter that plaintiff's statement of facts includes argument and comment in violation of Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018). While we may strike a statement of facts or dismiss an appeal based upon such violations, we decline to do so here, as the violations do not hinder our review. See *O'Gorman v. F.H. Paschen, S.N. Nielsen, Inc.*, 2015 IL App (1st) 133472, ¶ 80. However, we disregard the noncompliant portions of plaintiff's statement of facts. See *id.*

¶ 25 Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). "The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists." *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162 (2007). In determining whether there is a genuine issue of material fact, the pleadings, depositions, admissions, and affidavits must be construed strictly against the movant and liberally in favor of the opponent. *Id.* A triable issue of fact exists where there is a dispute as to a material fact or where, although the material facts are not in dispute, reasonable minds might differ in drawing inferences from those facts. *Id.* at 162-63. Although summary judgment can aid in the expeditious disposition of a lawsuit, it is a drastic measure and, thus, should be allowed only where the movant's right to judgment is "clear and free from doubt." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). We review summary judgment rulings *de novo*. *Id.*

¶ 26 With these concepts in mind, we address whether the trial court properly entered summary judgment in Android's favor on the exclusive-remedy defense under the Act. The Act is intended to provide financial protection to workers for accidental injuries arising out of and in the course of employment. *Falge v. Lindoo Installations, Inc.*, 2017 IL App (2d) 160242, ¶ 14 (citing *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 462 (1990)). Accordingly, the Act imposes upon the employer liability without fault but prohibits the employee from bringing a common-law suit against the employer. *Id.* (citing *Meerbrey*, 139 Ill. 2d at 462). Section 5(a) of the Act sets forth this exclusive remedy:

> "No common law or statutory right to recover damages from the employer *** for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act ***." 820 ILCS 305/5(a) (West 2012).

The exclusive-remedy provision is part of the *quid pro quo* pursuant to which the employer assumes liability without fault but is relieved of the prospect of large verdicts for damages. *Meerbrey*, 139 Ill. 2d at 462.

¶ 27 The issue in this case is whether Android is entitled to immunity under the exclusive-remedy provision as a borrowing employer under the Act. "An employee in the general employment of one person may be loaned to another for the performance of special work and become the employee of the person to whom he is loaned while performing the special

service." *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341, 346-47 (1980). Our supreme court has long recognized the applicability of the common-law borrowed-employee doctrine to workers' compensation cases. *Id.* at 347; *Falge*, 2017 IL App (2d) 160242, ¶ 15.

¶ 28 The Act specifically incorporates the borrowed-employee doctrine and extends the immunity of the exclusive-remedy provision to borrowing and loaning employers. 820 ILCS 305/1(a)(4) (West 2012); *Falge*, 2017 IL App (2d) 160242, ¶ 14. Section 1(a)(4) provides:

"Where an employer operating under and subject to the provisions of this Act loans an employee to another such employer and such loaned employee sustains a compensable accidental injury in the employment of such borrowing employer and where such borrowing employer does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act and as to such employee the liability of such loaning and borrowing employers is joint and several, provided that such loaning employer is in the absence of agreement to the contrary entitled to receive from such borrowing employer full reimbursement for all sums paid or incurred pursuant to this paragraph together with reasonable attorneys' fees and expenses in any hearings before the Illinois Workers' Compensation Commission or in any action to secure such reimbursement." 820 ILCS 305/1(a)(4) (West 2012).

¶ 29 Significantly, too, section 1(a)(4) further provides that "[a]n employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section." *Id.*

¶ 30 Plaintiff contends that, as a "threshold" matter, he was entitled to summary judgment on the exclusive-remedy defense because Android neither paid plaintiff's workers' compensation insurance premiums or benefits nor was obliged to reimburse Staff on Site for the expenses. Moreover, plaintiff contends, Android failed to establish the existence of a borrowed-employee relationship and thus was not entitled to immunity under the Act.

¶ 31 A. Payment of or Obligation to Reimburse for Workers'
Compensation Premiums or Benefits

¶ 32 We turn first to plaintiff's position that the payment of or obligation to reimburse for workers' compensation premiums or benefits should be considered a prerequisite for exclusive-remedy protection under the Act. To hold otherwise, plaintiff contends, would be to turn the Act's exclusive-remedy protection into a "sword instead of a shield." But plaintiff's argument fails to appreciate the framework of the borrowed-employee relationship as set forth in section 1(a)(4).

¶ 33 The plain language of section 1(a)(4) explicitly contemplates that the loaning employer, rather than the borrowing employer, may be the entity that provides or pays the workers' compensation premiums or benefits. See *id.* Specifically, "where such borrowing employer does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act." *Id.* Yet the statute further specifies that the liability of the borrowing and loaning

- 8 -

employers is joint and several and that the loaning employer is, "in the absence of [an] agreement to the contrary," entitled to reimbursement from the borrowing employer "for all sums paid or incurred pursuant to this paragraph," in addition to the specified attorney fees and expenses. *Id.*

¶ 34    Thus, "regardless of which of the two employers pays the workers['] compensation benefits, the exclusivity provision of the Act immunizes both the borrowing employer and the lending employer from further claims." *Illinois Insurance Guaranty Fund v. Virginia Surety Co.*, 2012 IL App (1st) 113758, ¶ 19. The legislature "did not require both a lending employer and borrowing employer to procure identical coverage for the same employees." *Id.*

¶ 35    Here, the contract between Android, as the borrowing employer, and Staff on Site, as the loaning employer, required Staff on Site to maintain workers' compensation coverage for the temporary employees it provided to Android. Staff on Site, as agreed, maintained workers' compensation coverage for plaintiff. Plaintiff filed a workers' compensation claim against Staff on Site and received workers' compensation benefits.

¶ 36    Plaintiff nonetheless contends that there must be a reimbursement requirement in order to maintain exclusive-remedy protection under the Act. In other words, according to plaintiff, Android is not entitled to exclusive-remedy protection because it was not obligated to reimburse Staff on Site for the workers' compensation premiums or benefits. Plaintiff insists that nothing in the contract between Staff on Site and Android indicates that Staff on Site has a right of reimbursement.

¶ 37    However, there was no need to incorporate a right of reimbursement into the contract. The reimbursement right is explicitly set forth in section 1(a)(4). The statute specifies that the liability of the borrowing and loaning employers is joint and several and that the loaning employer is "entitled to receive from such borrowing employer full reimbursement for all sums paid or incurred pursuant to this paragraph" in addition to the specified attorney fees and expenses. 820 ILCS 305/1(a)(4) (West 2012). The statute also provides that there may be an "agreement to the contrary." *Id.* There was an agreement to the contrary here whereby Staff on Site was responsible for workers' compensation coverage. An agreement to the contrary, as contemplated by the statute, does not eliminate a borrowing employer's right to exclusive-remedy protection under the Act. See *Chaney v. Yetter Manufacturing Co.*, 315 Ill. App. 3d 823, 826-27, 830 (2000).

¶ 38    The court in *Chaney* rejected essentially the same argument plaintiff makes here. The plaintiff was an employee of a temporary placement agency. *Id.* at 825. The agency placed the plaintiff at Yetter Manufacturing Company (Yetter). *Id.* The agreement between the agency and Yetter provided that the agency was responsible for workers' compensation and general liability coverage for all temporary employees and that the agency indemnified and held Yetter harmless "from any judgment, finding, or assessment of liability under the *** Act or the laws of Illinois" for a temporary employee's injuries. *Id.* The plaintiff was injured in a work-related accident. *Id.* After recovering workers' compensation benefits from the agency, the plaintiff filed a personal-injury suit against Yetter. *Id.* The trial court granted summary judgment in Yetter's favor on the exclusive-remedy defense under the Act by virtue of the borrowed-employee relationship. *Id.* at 825-26.

¶ 39    In affirming, the appellate court rejected the plaintiff's argument that the agreement between the agency and Yetter, whereby the agency was responsible for workers' compensation claims and agreed to indemnify and hold Yetter harmless from any such claims,

- 9 -

eliminated the exclusive-remedy protection. *Id.* at 830. In analyzing section 1(a)(4), the appellate court reasoned that

> "with respect to an injured employee, the liability of the loaning and borrowing employers is joint and several; as between employers, the borrowing employer is primarily liable and the loaning employer [is] secondarily liable, the latter being required to pay only when the borrowing employer fails to do so, and is then entitled to reimbursement from the borrowing employer." *Id.* at 826-27.

The loaning employer's right to reimbursement, however, may be waived by an agreement between the loaning and borrowing employers. *Id.* at 827. Accordingly, the appellate court held, "[t]o adopt plaintiffs' argument would require us to ignore the Act's explicit provisions making borrowing and loaning employers jointly and severally liable to the employee." *Id.* at 830; accord *Reichling v. Touchette Regional Hospital, Inc.*, 2015 IL App (5th) 140412, ¶ 42 ("We, therefore, reject the plaintiff's argument that [the borrowing employer] should be subject to common law tort liability in this case because, pursuant to its agreement with [the temporary staffing agency], it was not liable under the Act.").

¶ 40    Plaintiff discounts *Chaney* and *Reichling* because those decisions contain "no reimbursement discussion." His position is that "[e]xclusive remedy protection is predicated upon an obligation to pay for [workers'] compensation insurance and claims, either directly or with full reimbursement by employers, including borrowing employers." However, none of the cases upon which plaintiff relies involved a borrowed-employee relationship under section 1(a)(4). See *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196 (2008) (joint venturer); *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274 (2007) (parent corporation); *Burge v. Exelon Generation Co.*, 2015 IL App (2d) 141090 (sole member of employer limited liability company); *Kay v. Centegra Health System*, 2015 IL App (2d) 131187 (joint employer); *Schmidt v. Milburn Brothers, Inc.*, 296 Ill. App. 3d 260, 269 (1998) (joint employer or joint venturer).

¶ 41    The issue in *Ioerger*, for instance, was whether a co-venturer was entitled to invoke the Act's exclusive-remedy protection. *Ioerger*, 232 Ill. 2d at 202-05. Midwest Foundation Corporation (Midwest) and Halverson Construction Company, Inc. (Halverson), entered into a joint-venture agreement in connection with a bridge-repair project; their contract provided that profits and losses would be shared 60/40, respectively, with each making proportional, periodic contributions. *Id.* at 198-99. Their contract further provided that Midwest was responsible for workers' compensation insurance but was entitled to reimbursement from the joint venture for the incurred costs. *Id.* at 199. The plaintiffs were employed by Midwest and suffered work-related injuries; they brought workers' compensation claims against Midwest and received benefits. *Id.* at 199-200. It was undisputed that under section 5(a) of the Act (820 ILCS 305/5(a) (West 2000)) the plaintiffs' exclusive remedy against Midwest was the workers' compensation claims. *Ioerger*, 232 Ill. 2d at 200. However, the plaintiffs also brought a personal-injury action against Halverson and the joint venture. *Id.*

¶ 42    In holding that Halverson and the joint venture were likewise entitled to the Act's exclusive-remedy protection, the supreme court reasoned that Halverson was Midwest's agent, as a co-venturer with Midwest. *Id.* at 202. The court further reasoned that the joint venture was "inseparable from its constituent entities, Midwest and Halverson," such that, because "[b]oth of those entities" were "immunized by the exclusive remedy provision[ ] *** , it necessarily follows that the [j]oint [v]enture was likewise shielded." *Id.* at 203.

¶ 43    The supreme court further explained that allowing the joint venture to invoke the exclusive-remedy provision was "mandated by the principles underlying the Act's remedial scheme." *Id.* That is, "allowing a party who has paid nothing toward an injured employee's workers' compensation benefits to nevertheless invoke the Act's immunity to escape tort liability for the employee's injuries would be tantamount to allowing the party 'to have its cake and eat it too.' " *Id.* (quoting *Forsythe*, 224 Ill. 2d at 298 (holding that a parent corporation was not entitled to the Act's exclusive-remedy protection afforded its subsidiary/employer)). "By the same token, subjecting a party to tort liability for an employee's injuries notwithstanding the fact that the party has borne the costs of the injured employee's workers' compensation insurance would be the same as declaring that a party who has paid for the cake may neither keep it nor eat it." *Id.* The court concluded that, "[a]s these metaphors illustrate, the immunity afforded by the Act's exclusive remedy provision[ ] is predicated on the simple proposition that one who bears the burden of furnishing workers' compensation benefits for an injured employee should not also have to answer to that employee for civil damages in court." *Id.*

¶ 44    In *Burge*, this court cited the rationale in *Ioerger* and *Forsythe* in holding that the defendant, Exelon Generation Company, LLC (Exelon), which was the sole member of the employer Exelon Nuclear Security, LLC (ENS), failed to establish that it was entitled to exclusive-remedy protection. *Burge*, 2015 IL App (2d) 141090, ¶¶ 10-14. The plaintiff in *Burge* suffered a work-related accident at ENS; he filed and settled a workers' compensation claim against ENS. *Id.* ¶ 2. The plaintiff then filed a negligence action against Exelon. *Id.* ¶ 1. Exelon moved to dismiss on the ground that the plaintiff's exclusive remedy was under the Act. *Id.* Exelon argued that, "because it had reimbursed ENS for workers' compensation payments, and because of its authority to manage ENS's affairs, it was cloaked with the same immunity as ENS." *Id.* ¶ 6. The trial court agreed and granted Exelon's motion to dismiss. *Id.* ¶ 1.

¶ 45    In reversing, we rejected Exelon's argument that it was entitled to immunity as the agent of ENS because Exelon failed to establish that ENS had any right to control Exelon. *Id.* ¶ 9. We also rejected Exelon's argument that it was entitled to immunity based upon its alleged payment of workers' compensation benefits because Exelon failed to prove the purported payment by affidavit and the agreement between Exelon and ENS was silent regarding the obligation to provide workers' compensation benefits. *Id.* ¶¶ 12-17.

¶ 46    In *Kay*, we affirmed the grant of summary judgment in the defendant's favor on the exclusive-remedy defense because the evidence established that the defendant was a joint employer of the plaintiff. *Kay*, 2015 IL App (2d) 131187, ¶ 22. In doing so, we noted that the defendant paid for the plaintiff's workers' compensation insurance. *Id.* In *Schmidt*, the court reversed the grant of summary judgment in the defendants' favor on the ground that there were genuine issues of material fact as to whether the defendants were entitled to the Act's exclusive-remedy protection as joint employers or joint venturers. *Schmidt*, 296 Ill. App. 3d at 265-70. The court pointed out that to afford the defendants immunity without any corresponding obligation in securing and paying for workers' compensation insurance and benefits would turn the exclusive-remedy provision "into a sword, instead of a shield." *Id.* at 269-70.

¶ 47    Plaintiff contends that these cases stand for the general principle that the Act's exclusive-remedy provision is predicated on the payment of or obligation to reimburse for workers' compensation premiums or benefits. Initially, we note our recent decision in *Hiatt v. Illinois*

*Tool Works*, 2018 IL App (2d) 170554, ¶¶ 64-67, which neither party cites, in which we held that the defendant distributor was entitled to invoke the exclusive-remedy defense as a joint venturer with the manufacturer employer even though the defendant did not pay for the workers' compensation benefits. In *Hiatt*, we pointed out that *Burge* was "predicated on the fact that the entities were separate," as it was established that ENS had no right to control Exelon and was therefore not ENS's agent. *Id.* ¶ 66 (citing *Burge*, 2015 IL App (2d) 141090, ¶ 9). In *Hiatt*, we also pointed out that "*Kay* never held that immunity under the exclusive-remedy provision extends only to members of a joint venture that contribute to workers' compensation. *Kay* did not even address that argument." *Id.* ¶ 64 (citing *Kay*, 2015 IL App (2d) 131187, ¶¶ 22, 29). Accordingly, plaintiff's reliance upon these cases is misplaced.

¶ 48        Regardless, as stated, none of the cases upon which plaintiff relies involved a borrowed-employee relationship under section 1(a)(4). Indeed, the court in *Schmidt* explicitly recognized the distinction: "We have attempted to steer clear of the 'borrowed' or 'loaned' employee decisions. Those cases ordinarily deal with the employee's contractual expectations, a matter that is of little import in this case. *** This case *** is not about 'loaned' or 'borrowed' employees." *Schmidt*, 296 Ill. App. 3d at 266-67.

¶ 49        Plaintiff persists that allowing Android to invoke immunity under the exclusive-remedy provision of the Act would be tantamount to "allowing a party to have its cake and eat it too." The metaphor is inapt here. This case involves whether a borrowed-employee relationship existed under section 1(a)(4) of the Act. There was no cake here for either employer; there was joint and several liability. Under the plain language of section 1(a)(4), the liability of the borrowing and loaning employers is joint and several, and the loaning employer is, "in the absence of [an] agreement to the contrary," entitled to reimbursement from the borrowing employer "for all sums paid or incurred pursuant to this paragraph," in addition to the specified attorney fees and expenses. 820 ILCS 305/1(a)(4) (West 2012). Here, there was in fact a specific agreement to the contrary. Plaintiff's argument would have us ignore the plain language of the statute. Accordingly, plaintiff presents no persuasive argument upon which to hold that he was entitled to summary judgment on the ground that Android neither paid his workers' compensation insurance premiums or benefits nor was obliged to reimburse Staff on Site for the expenses.

¶ 50                                    B. Borrowed-Employee Relationship

¶ 51        Plaintiff nevertheless argues that, at a minimum, there were genuine issues of material fact as to whether a borrowed-employee relationship existed. To invoke the Act's exclusive-remedy provision, Android was required to establish that under section 1(a)(4) Staff on Site was a loaning employer and Android was a borrowing employer. Plaintiff does not dispute that Staff on Site was a loaning employer under section 1(a)(4). As discussed, section 1(a)(4) specifically identifies a loaning employer as one

> "whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers." *Id.*

The record establishes that, as a temporary staffing agency that contracted with Android to provide temporary employees "with certain skills and abilities," Staff on Site was a loaning

employer under section 1(a)(4). See *Falge*, 2017 IL App (2d) 160242, ¶ 16 ("There is no question that Labor Ready [(a temporary staffing agency)] qualifies as a loaning employer.").

¶ 52    We must determine, however, whether there was a genuine issue of material fact with respect to whether Android qualified as a borrowing employer under the Act. To evaluate the existence of a borrowed-employee relationship for purposes of the exclusive-remedy provision, we must consider (1) whether the alleged borrowing employer had the right to direct and control the manner in which the employee performed the work and (2) whether there was an express or implied contract of hire between the employee and the alleged borrowing employer. *A.J. Johnson Paving*, 82 Ill. 2d at 348; *Falge*, 2017 IL App (2d) 160242, ¶ 16. Whether a borrowed-employee relationship existed is generally a question of fact. *A.J. Johnson Paving*, 82 Ill. 2d at 348; *Falge*, 2017 IL App (2d) 160242, ¶ 16. However, if the facts are undisputed and permit but a single inference, the question may be resolved as a matter of law. *A.J. Johnson Paving*, 82 Ill. 2d at 348-49; *Falge*, 2017 IL App (2d) 160242, ¶ 16.

¶ 53                    1. Direction and Control of Plaintiff's Work

¶ 54    In resolving whether a borrowed-employee relationship existed, the primary consideration is the first element set forth above—whether the alleged borrowing employer had the right to direct and control the manner in which the employee performed the work. *A.J. Johnson Paving*, 82 Ill. 2d at 348-49; *Falge*, 2017 IL App (2d) 160242, ¶ 17. The following factors support a determination that the borrowing employer had the right to direct and control the manner in which the employee performed the work: (1) the employee worked the same hours as the borrowing employer's employees, (2) the employee received instruction from the borrowing employer's foreperson and was assisted by the borrowing employer's employees, (3) the loaning employer's supervisors were not present, (4) the borrowing employer was permitted to tell the employee when to start and stop working, and (5) the loaning employer relinquished control of its equipment to the borrowing employer. *A.J. Johnson Paving*, 82 Ill. 2d at 349; *Falge*, 2017 IL App (2d) 160242, ¶ 17.[2]

¶ 55    This court's recent decision in *Falge*, holding that a borrowed-employee relationship existed for purposes of the Act's exclusive-remedy provision, involved facts analogous to the instant case. There, too, the plaintiff was employed by a temporary staffing agency, Labor Ready Midwest (Labor Ready). *Falge*, 2017 IL App (2d) 160242, ¶ 1. Labor Ready assigned the plaintiff to work for the defendant, Lindoo Installations, Inc. (Lindoo). *Id.* The plaintiff was injured while setting up industrial shelving at a warehouse and filed for and obtained workers' compensation benefits from Labor Ready. *Id.* The plaintiff then filed a negligence lawsuit against Lindoo. *Id.* The trial court granted Lindoo summary judgment on its exclusive-remedy defense. *Id.* This court affirmed. *Id.*

¶ 56    We held that the undisputed material facts demonstrated that Lindoo directed and controlled the plaintiff's work. *Id.* ¶¶ 22-24, 27. While the plaintiff testified at his deposition

---

[2]Quoting *Gundich v. Emerson-Comstock Co.*, 21 Ill. 2d 117, 123 (1960), a Structural Work Act case, plaintiff contends that the test for whether a borrowing employer had the right to direct and control the manner in which the employee performed the work should be whether the employee was " 'wholly subject to [the borrowing employer's] control and freed during such time from the direction and control of his master.' " Plaintiff's argument ignores countless decisions setting forth the relevant analysis, including the supreme court's decision in *A.J. Johnson Paving*, 82 Ill. 2d at 348-49.

that there did not appear to be any direct supervisors from Lindoo who were actually directing his work, he further testified that he was taking directions from Lindoo's employees when he was injured. *Id.* ¶ 22. The plaintiff testified that the directions were difficult to understand because many of Lindoo's employees spoke Spanish but that he understood what he was supposed to do through the use of hand gestures and other nonverbal communication. *Id.* The evidence also established that Lindoo set the plaintiff's work schedule, controlled when he took his breaks, and provided him with the tools to perform the tasks it assigned. *Id.* Moreover, the contract between Labor Ready and Lindoo stated that all temporary employees provided to Lindoo were under Lindoo's supervision and direction. *Id.* ¶ 23.

¶ 57 Likewise, here, there were no genuine issues of material fact with respect to Android's direction and control of plaintiff's work. First, regarding the hours plaintiff worked, it was undisputed that there were two shifts at Android, that plaintiff worked primarily the second shift, and that plaintiff's working hours were the same as those of Android's second-shift employees. Plaintiff contends that "Brown cannot say how many Android workers, as opposed to temporary workers, were on site at those times." This fact is not material. The determinative issue is whether plaintiff worked the same hours as *Android's* employees. See *id.* ¶ 17. Plaintiff cites no evidence that the hours he worked varied from those worked by Android's employees.

¶ 58 Regarding whether plaintiff received instruction and assistance from Android supervisors and employees, plaintiff testified that "Mike and Wil" were the supervisors "who instructed [him] on what to do." Plaintiff argues that his deposition testimony merely established his "assumption" that these individuals worked for Android. But a review of the entirety of plaintiff's deposition testimony, as well as Brown's deposition testimony, reflects multiple references to these individuals as supervisors at Android. The only reasonable inference that can be drawn from the undisputed facts is that plaintiff received instruction from Android supervisors.

¶ 59 Plaintiff argues that, regardless, as set forth in his verified statement, "[b]y the day of the accident, [he] worked independently, with less than a minute of instruction from Android." The fact that plaintiff's skill as a forklift operator allowed him control over the operation of the equipment is not material. See *A.J. Johnson Paving*, 82 Ill. 2d at 349 (the "fact that claimant's skill as an operator allowed him to exercise control over the paving machine and the technical details of the paving operation was insufficient to preclude a finding that [the defendant] had the right to control the manner of the work"). The issue is the source of plaintiff's instruction and assistance. Brown testified that Android employees provided plaintiff's assignments and that there were always "startup" meetings before shifts. There was no evidence that anyone at Staff on Site provided instruction or assistance to plaintiff on his duties and operation of a forklift at Android. Thus, the record demonstrates no genuine issue of material fact with respect to plaintiff's receipt of instruction and assistance from Android supervisors and employees.

¶ 60 As for the third factor—the presence of any Staff on Site supervisors—plaintiff concedes that no Staff on Site supervisors were present at Android while he worked there.

¶ 61 Regarding whether Android was permitted to tell plaintiff when to start and stop working, in his verified statement, plaintiff asserted that he never received an employee handbook from Android and that he "was never told [he] had to start or stop working when told by Android." The latter statement lacks clarity, and in any event, neither statement creates a genuine issue of material fact. As discussed, it was undisputed that there were two shifts at Android. And

- 14 -

Brown testified that, when a temporary employee arrives, "we say *** here's the hours of work." Brown also attested that Android controlled plaintiff's starting time and ending time and had the discretion to give plaintiff fewer or more hours. Moreover, the testimony established that plaintiff reported to Android; plaintiff was not required to report to Staff on Site before or after a shift.

¶ 62 Finally, it was undisputed that plaintiff used Android's equipment to perform his duties as a forklift operator. Android alleged in its exclusive-remedy defense that "[a]t all times relevant [p]laintiff used equipment provided by [Android]." Plaintiff admitted this allegation in his reply to Android's defense. Brown also specifically testified that the equipment plaintiff used was owned or leased by Android. Accordingly, viewing the evidence in the light most favorable to plaintiff, the record demonstrates no genuine issue of material fact with respect to Android's direction and control of plaintiff's work.

¶ 63 Plaintiff nevertheless contends that summary judgment in Android's favor was improper because the evidence demonstrated that Android lacked the power to terminate him. Plaintiff cites Brown's deposition testimony that Android "can ask the staffing agency not to have [the worker] return" but "we don't fire them." Plaintiff also points out that the contract between Android and Staff on Site lacked a specific provision granting Android the right to refuse a particular worker.

¶ 64 We recognized in *Falge* that whether a borrowing employer had the right to discharge the employee can be an additional consideration in determining whether the borrowing employer had the right to direct and control the manner of the employee's work. *Falge*, 2017 IL App (2d) 160242, ¶ 18. But, as we explained in *Falge*, the borrowing employer need not have the power to dismiss the employee from his *general employment*. *Id.* Rather, the borrowing employer must have the power to dismiss the employee from the *borrowed employment*. *Id.*; accord *Chaney*, 315 Ill. App. 3d at 829.

¶ 65 Here, while Android lacked the power to terminate plaintiff from his general employment with Staff on Site, the record demonstrates no genuine issue of material fact with respect to Android's power to dismiss plaintiff from his temporary employment at Android. Brown testified that Android "can ask the staffing agency not to have [the worker] return" and to "end their assignment here." Brown further confirmed that Android had the right to remove the worker from its facility and tell the worker to return to Staff on Site. Plaintiff's position that Staff on Site could continue to send the worker to Android is unfounded. As Brown testified, that would "get old in a hurry." Indeed, plaintiff acknowledged as much when he testified that Android "can compel [his] employer to get rid of [him]." Plaintiff's representations in his verified statement regarding his beliefs and what he was told with respect to the relationship between Android and Staff on Site do not change the result. See *Morales v. Herrera*, 2016 IL App (1st) 153540, ¶ 28 (the plaintiff's "personal definition of an 'employer' has no bearing on whether [the defendant] was her employer as defined by Illinois law").

¶ 66 As a final matter, plaintiff contends that summary judgment in Android's favor was improper because it was undisputed that he received his salary from Staff on Site. This precise argument was rejected by our supreme court in *A.J. Johnson Paving*, 82 Ill. 2d at 349 (the court did not "deem relevant" that the employee was paid by the loaning employer rather than the borrowing employer; "[t]he mere fact that the employee does not receive his wages from the [borrowing] employer will not defeat the finding of a loaned-employee situation"). Accord *Falge*, 2017 IL App (2d) 160242, ¶ 23 ("It is inconsequential who actually was paying plaintiff

- 15 -

for his services."). Thus, the record demonstrates no genuine issue of material fact with respect to Android's direction and control of plaintiff's work.

¶ 67                              2. Express or Implied Contract of Hire Between Android and Plaintiff

¶ 68        An employee's consent to the requisite contract of hire with the borrowing employer may be implied in the context of a business like a temporary employment agency. *Falge*, 2017 IL App (2d) 160242, ¶ 25; *Morales*, 2016 IL App (1st) 153540, ¶¶ 31-33; *Chaney*, 315 Ill. App. 3d at 829. In *Falge*, the testimony demonstrated that the plaintiff knew he was working for Lindoo through Labor Ready and that he accepted the temporary employment assignment. *Falge*, 2017 IL App (2d) 160242, ¶ 25. Thus, the plaintiff impliedly consented to the borrowed-employee relationship. *Id.* In *Morales*, the temporary employment agency sent the plaintiffs to work at the defendant's facility. *Morales*, 2016 IL App (1st) 153540, ¶ 32. The evidence established that the plaintiffs accepted the assignment when they "set out to go there" and accordingly had an implied contract for hire with the defendant. *Id.* ¶¶ 31-32. In *Chaney*, there was no dispute that the plaintiff knew she was working for the defendant through the temporary placement agency. *Chaney*, 315 Ill. App. 3d at 829-30. The plaintiff therefore impliedly agreed to the borrowed-employee relationship. *Id.* at 830.

¶ 69        Here, too, the evidence established that Staff on Site, as a temporary staffing agency, placed plaintiff at Android's facility. Plaintiff accepted the assignment and worked for Android as a forklift operator. Thus, plaintiff impliedly agreed to the borrowed-employee relationship. Plaintiff, however, contends that we should consider the express contract between Android and Staff on Site rather than looking to an implied contract. The court in *Morales* rejected the same argument in holding that "the agreement between [the defendant] and [the temporary employment agency] has no bearing on [the] plaintiffs' implied contract for hire with [the defendant]." *Morales*, 2016 IL App (1st) 153540, ¶ 33. The "loaned employee concept depends on a contract of hire 'between the employee and the special employer,' not the details of the contract between the two employers." *Id.* (quoting *A.J. Johnson Paving*, 82 Ill. 2d at 348). Accordingly, the evidence establishes that plaintiff had an implied contract for hire with Android.

¶ 70        In sum, viewing the evidence strictly against Android and liberally in favor of plaintiff, we conclude that there is no genuine issue of material fact with respect to the existence of a borrowed-employee relationship. The trial court, therefore, properly entered summary judgment in favor of Android on the exclusive-remedy defense set forth in the Act.

¶ 71                                        III. CONCLUSION

¶ 72        For the reasons stated, we affirm the trial court's order granting summary judgment in favor of Android.

¶ 73        Affirmed.